CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 1 5 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JEANETTE LOUISE CABANISS,<br>    Plaintiff,<br><br>v.<br><br>LINDA S. MCMAHON,<br>COMMISSIONER OF SOCIAL SECURITY<br>    Defendant. | Civil Action No. 7:06cv00536<br><br>By: Hon. Michael F. Urbanski<br>United States Magistrate Judge |

## MEMORANDUM OPINION

Plaintiff Jeanette Louise Cabaniss ("Cabaniss") brought this action for review of the Commissioner of Social Security's decision denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383. The parties have consented to the undersigned's jurisdiction, and the case is before the court on cross motions for summary judgment. Having reviewed the record, and after briefing and oral argument, the case is now ripe for decision. Applying the treating physician rule, the court finds that the Commissioner's decision is not supported by substantial evidence. A question remains, however, as to the appropriate onset date. Therefore, the case will be remanded to the Commissioner for determination of an appropriate onset date and payment of benefits.

I.

Cabaniss was born on November 30, 1947, and she completed the eighth grade. (Administrative Record [hereinafter R.] at 13, 63, 368-69) Cabaniss' previous work consists solely of employment as a sitter/companion for the elderly in 1994 and 1995, (R. 78-79, 369), and she had not worked for nearly ten years before she filed her application for SSI benefits on June 23, 2004.

In her SSI benefits application, Cabaniss stated that she became disabled on June 30, 2000, due to colitis, gall bladder problems, hypertension, a brain aneurysm, chronic obstructive pulmonary disorder ("COPD"), and migraines. (R. 63-64, 66-68) Cabaniss' claim was denied at both the initial and reconsideration levels of administrative review, (R. 11), and a hearing was held before an ALJ on April 24, 2006. (R. 365-88) On May 19, 2006, the ALJ issued a decision denying Cabaniss' claim for benefits, finding that although she suffers from severe impairments, she retains the residual functional capacity ("RFC") to do a range of sedentary work.[1] Additionally, the ALJ determined that Cabaniss could do her past work as a sitter/companion and, thus, is not disabled. (R. 16-18)

The ALJ's decision became final for the purposes of judicial review under 42 U.S.C. § 405(g) on August 18, 2006, when the Appeals Council denied Cabaniss' request for review. (R. 6-9) Cabaniss then filed this action challenging the Commissioner's decision.

## II.

Judicial review of a final decision regarding disability benefits under the Act is limited to determining whether the ALJ's findings "are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing 42 U.S.C. § 405(g)). Accordingly, the reviewing court may not substitute its judgment for that of the ALJ, but instead must defer to the ALJ's determinations if they are supported by substantial

---

[1]Sedentary work requires exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. Occasionally means activity or condition exists up to 1/3 of the time and frequently means activity or condition exists from 1/3 to 2/3 of the time. http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

2

evidence. Id. Substantial evidence is such relevant evidence which, when considering the record as a whole, might be deemed adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays, 907 F.2d at 1456; Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

### III.

Cabaniss argues that the ALJ failed to afford appropriate weight to her treating physician's assessment of her functional abilities and failed to properly consider the medical evidence in the record in determining that she maintains the ability to do her past relevant work as a sitter/companion. Accordingly, she asks that the ALJ's decision be reversed.

On April 14, 2006, Dr. Morgan, Cabaniss' treating physician, completed a Medical Source Statement of Ability to do Work-Related Activities. Dr. Morgan noted that because of Cabaniss' poorly controlled hypertension, peripheral vascular disease, cerebral aneurysm, carotid blockages, and problems with her gastrointestinal tract, she is only able lift less than ten pounds; she can only stand or walk four hours in an eight hour day and sit less than six hours in an eight hour day; she has limited ability to push and/or pull in her upper and lower extremities; she can occasionally kneel, crouch, crawl, and/or stoop; she can never climb or balance; she has limited occasional reaching ability, but unlimited handling, fingering, and feeling ability; she has no visual or communicative limitations; and she has environmental limitations of limited exposure to temperature extremes, noise, dust, humidity, and hazards, but unlimited exposure to vibration and fumes, odors, chemicals, and gases. He further opined that her impairments would cause her to miss more than three days of work each month. (R. 352-57)

3

Case 7:06-cv-00536-mfu   Document 18   Filed 08/15/07   Page 3 of 16   Pageid#: 68

At the administrative hearing held later that month on April 24, 2006, the ALJ noted that "the crucial part for me, of course, is why does Dr. Morgan believe that she would miss more than three times per month." (R. 385) The ALJ asked Cabaniss to supplement the record on this point as well as to provide further information as to the severity of her depression. In response to a questionnaire on these points, Dr. Morgan replied that Cabaniss "has the illnesses listed in my previous letter. It is all of these illnesses that would cause her to be absent from work." (R. 361)

Absent persuasive contradictory evidence, the "treating physician rule" generally "requires that the fact-finder give greater deference to the expert judgment of a physician who has observed the patient's medical condition over a prolonged period of time." Elliott v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999). The ALJ may only afford a treating physician's opinion little or no weight if it is conclusory and/or is not supported by objective testing or the record as a whole. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Further, in such instances where the ALJ does not give a treating source's opinion controlling weight, the ALJ must set forth a detailed, reasonable, and rationale basis for the weight ultimately accorded to that opinion. 20 C.F.R. § 416.927. Cabaniss had been treated by Dr. Morgan for a myriad of conditions since 1990 or 1991. (R. 376) Cabaniss testified that she saw Dr. Morgan generally twice a month. (R. 376) Despite the length of this treatment relationship, the ALJ determined Dr. Morgan's assessment as to Cabaniss' ability to do work-related activities and the likelihood of absences was not consistent with the record as a whole and, therefore, was not entitled to controlling weight. (R. 17)

Review of the medical records in the administrative record reveals that Cabaniss was diagnosed with moderate to severe narrowing in the right internal carotid artery and a small interior carotid aneurysm in the fall of 2000, but before that she had complained of a variety of maladies, including gastrointestinal discomfort with cramping, bloating, gas, vomiting, and indigestion likely caused by irritable bowel syndrome; gallstones; shortness of breath associated with bronchitis; heart palpitations; hypertension, and symptoms associated with a brain aneurysm. (R. 330-334, 339) The carotid stenosis was surgically repaired in February 2001 without any complications. (R. 326-29)

In September 2001, Cabaniss presented at the Carilion Roanoke Memorial Hospital with severe symptomatic cholelithiasis[2] with smoldering cholecystosis.[3] The hospital notes reveal that Cabaniss had had gallstones for three years which caused periodic pain, but her symptoms had worsened and she was now unable to eat and suffered from persistent abdominal pain. Cabaniss was admitted to the hospital on September 18, 2001; on September 19, 2001, four large infected and impacted gallstones were removed by laparoscopic cholecystectomy with a choloangiogram with good results and no complications; and she was released two days later. (R. 340-50) In a follow-up appointment with Dr. Swartzendruber on October 4, 2001, Cabaniss noted that she had had no further gastrointestinal problems other than the occasional rapid onset of diarrhea following meals. Dr. Swartzendruber noted Cabaniss could control her symptoms by

---

[2]Cholelithiasis is the presence or formation of gallstones. Dorland's Illustrated Medical Dictionary 353 (30th ed. 2003).

[3]Cholecystosis refers to any non-inflammatory disease of the gallbladder. Dorland's Illustrated Medical Dictionary 352 (30th ed. 2003).

5

limiting her liquid intake and the size of her meals, and on exam, he found that she had normal bowel sounds and had healed without complication. (R. 351)

An electroencephalogram, which measures electric currents in the brain, taken in October 2001 was normal. Cabaniss voiced no new complaints to Dr. Davidson, her cardiologist, in December 2001 or January 2002. (R. 358, 329) Further, in January 2002, Dr. Davidson advised Cabaniss that her carotid disease on the side of her brain aneurysm was minimal, and she should proceed with treatment. (R. 329) There are no other treatment records from any physician until March 2003, when Cabaniss presented at Carilion Health System with complaints of chest pain. An EKG, myocardial perfusion study, and a CT of Cabaniss' abdomen and pelvis taken at that time were all negative. (R. 220-23)

On June 12, 2003, Cabaniss reported to Dr. Morgan at Carilion Family Medical with complaints of sweating, double vision, unintentional weight loss, fatigue and malaise, but denied chest pain, palpitations, syncope, coughing, dyspnea, or wheezing. (R. 214) On exam, Dr. Morgan found that Cabaniss appeared well nourished and in no acute distress, but that her existing problems, namely gastrointestinal reflux, irritable bowel syndrome, and hypertension, remained unchanged. Cabaniss was prescribed additional medications, she was scheduled to have labs done in the ensuing several weeks, and she was directed to call Duke about her aneurysm. (R. 214-15) When Cabaniss returned in August 2003, she had similar complaints of sweats, fatigue, malaise, and weight loss, but again denied chest pain, palpitations, syncope, cough, and/or wheezing. Dr. Morgan noted that Cabaniss appeared thin, her ongoing medical problems remained unimproved and he advised her to return in two months. (R. 208-09) When Cabaniss returned on October 20, 2003, Dr. Morgan noted that although Cabaniss appeared well

nourished, well developed, and in no acute distress, her ongoing medical problems remained unchanged and she complained she was experiencing migraine headaches. (R. 203) Likewise, her condition and illnesses remained unchanged on November 24, 2003. (R. 201-02)

Cabaniss returned for a follow-up exam six months later, on March 8, 2004. During her visit she noted that she continued to have headaches and "has had some problems with passing out again." However, she denied any fever, chills, sweats, anorexia, fatigue, malaise, weight loss, chest pain, syncope, dyspnea, coughing, and/or wheezing, and she admitted that she had missed doses of her medication. Dr. Morgan noted that none of Cabaniss' existing conditions had improved, but that she appeared to be in no acute distress and her lungs were clear. When she returned three days later, Cabaniss stated her headaches had improved with medication. (R. 196-97)

On May 11, 2004, Cabaniss presented with complaints of headaches, mild epigastric pain, nausea, and diarrhea. Dr. Morgan attributed Cabaniss' discomfort to gastrointestinal reflux, he adjusted Cabaniss' medication and advised her to return in three weeks, and he noted that her hypertension had deteriorated. (R. 194-95) She voiced similar complaints on June 3, 2004, (R. 186-87), and when she returned on June 17, 2004. (R. 180-81)

Shortly thereafter, Cabaniss applied for disability benefits. In the information provided by Cabaniss on her daily activities, she reported that "[e]very day is different because I can't count on my health to allow me to do anything or plan anything. I'm too sick for a daily routine." (R. 86) Cabaniss stated that she cannot "plan anything beyond today because I never know how my health will be the next day. I've even had to cancel doctor's appointments because I can't make it that day." (R. 87) Although her past relevant work, last done some ten

years before, was as an elderly sitter, Cabaniss stated that she "never can be alone with anybody that I have to be responsible for such as my small grandchildren, seniors who are not well. . . . My whole life has changed, now I live around my health." (R. 87, 93)[4]

Cabaniss was examined by Dr. Humphries of the Virginia Department of Rehabilitative Services on October 7, 2004. During her initial interview, Cabaniss complained of daily global headaches, which she had been experiencing for several years. As regards the headaches, Dr. Humphries noted that "[s]he has diminished function. She has to go to bed with headaches frequently. . . . She has a brain aneurysm diagnosed when they did a carotid evaluation and she is held off in doing anything about the brain aneurysm and feels that she has a chance to see and get to know her grandchildren." (R. 124) Dr. Humphries also noted that "[s]he has had varied diagnoses of ulcerative colitis and irritable bowel syndrome, and she believed that irritable bowel is the final diagnosis but she has had this for about 30 years. She ends up with as few as eight bowel movements a day and as many as all day long. . . . . She has intermittent cramping, lower abdominal pain and bloating." (R. 124) He also noted that Cabaniss suffers from hypertension and had been recently diagnosed with COPD, and she has shoulder and neck pain, which is exacerbated by lifting and carrying. On exam, Dr. Humphries found that Cabaniss was alert, appeared to be in no acute distress, she had a limited range of motion in her neck, but a full range of motion in her extremities and back, her lungs were clear with equal breath sounds

---

[4]As to her personal care, Cabaniss wrote that she must wear loose fitting clothes to decrease the pressure on her stomach. On really bad days, she stays in her robe. Cabaniss says she bathes, but never on a routine basis, stating that sometimes she has to put it off until she feels well enough. Because of her intestinal problems, Cabaniss needs to be near a toilet and states that she usually wears a large pad to avoid soiling herself and requires a change of clothes if she goes out. (R. 87)

8

bilaterally and only a few mild expiratory wheezes, and her heart was normal. (R. 124-26) X-rays taken the same day revealed no abnormalities of the lumbar spine. (R. 130) Based on his exam and the x-rays, Dr. Humphries concluded that Cabaniss' combined impairments would cause some functional limitations, namely that she is limited to sitting six hours in an eight hour work day, standing and/or walking six hours in an eight hour work day, lifting twenty-five pounds occasionally and ten pounds frequently. Dr. Humphries noted that she can only manage occasional fine manipulation, she cannot do overhead work, and she should avoid heights and hazards. (R. 126-27)

On October 14, 2004, Cabaniss was diagnosed with COPD by Dr. Johnson, who found she had a few mild expiratory wheezes bilaterally and slight breath sounds. (R. 131) A pulmonary function test on November 2, 2004 revealed moderate pulmonary obstruction with no immediate significant response to a bronchodilator. (R. 132-33, 136-37) X-rays of her chest taken the same day revealed that her lungs were clear and her cardiac silhouette was normal. (R. 140)

Cabaniss returned to Dr. Morgan on November 9, 2004, complaining of right leg pain after stepping in a hole. He gave her pain medication and advised her to return in two weeks. (R. 175-76) When Cabaniss returned on November 23, 2004, Dr. Morgan noted that Cabaniss complained she had passed out and had multiple episodes of syncope, which is a brief loss of consciousness resulting from insufficient blood flow to the brain. Dr. Morgan attributed this to the brain aneurysm, which Cabaniss did not want to have treated. (R. 173-74) Likewise, when she returned for a blood pressure check on December 21, 2004, Dr. Morgan noted Cabaniss' condition remained unchanged. (R. 168-69)

On February 7, 2005, Cabaniss returned to Dr. Morgan with acute bronchitis. On exam he found that she was "mildly ill" and congested, but she was not using her accessory muscles to breathe and she continued to smoke a pack of cigarettes a day. She was given an antibiotic and a corticosteroid[5] injection, and she was released. (R. 152-53) Cabaniss returned the following day and noted that she was feeling better, but still had some congestion and cough. Nonetheless, she continued to smoke. On exam Dr. Morgan noted some rales in her lungs, and he diagnosed her with bacterial pneumonia, but did not change her medication. (R. 154-56) When she returned the following day, on February 9, 2005, she reported that she was doing much better. (R. 157-59) In a follow-up visit on February 10, 2005, she was given another antibiotic injection, but she did not voice any new complaints and she did not return for any further treatment. (R. 160)

Cabaniss returned to her cardiologist, Dr. Davidson, for her yearly exam on May 18, 2005. Cabaniss stated since her last visit she had not experienced any strokes, ministrokes, or blindness, and that she continued to smoke about a pack of cigarettes a day. (R. 321) On exam, Dr. Davidson noted that Cabaniss' lungs were clear, her brachial, radial, and carotid pulses were normal, and her right carotid artery had no significant stenosis, but she had a systolic ejection murmur and her left carotid artery had a 60-79% irregular heterogeneous plaque. (R. 322-24) Dr. Davidson recommended that Cabaniss continue with aspirin therapy and return in a year for another check-up. (R. 323)

Cabaniss returned to Dr. Morgan six months later, on October 12, 2005, for acute exacerbation of her COPD leading to pneumonia. (R. 260) She was admitted to the hospital

---

[5]A corticosteroid works by modifying the body's immune system response and decreasing inflamation. http://www.drugs.com/cdi/depo-medrol-suspension.html.

with complaints of a gradually worsening cough, congestion, and low grade fever. (R.237-39) On exam, Dr. Morgan found she had bilateral wheezing in her lungs on expiration, but a chest x-ray on October 13, 2005, revealed no acute cardiopulmonary abnormalities. (R. 237-39, 283, 307) Cabaniss remained hospitalized for several days during which she was treated with oxygen therapy and aerosol Albuterol[6]. (R. 250-54, 258) She was also given a flu vaccine and a pneumonia vaccine. (R. 249) Cabaniss was released on October 18, 2005. (R. 236-99)

In a follow-up exam with Dr. Morgan on October 22, 2005, he noted that Cabaniss had improved, her lungs were clear with no indication of rales or wheezes, and she remained only somewhat congested. During the course of the exam, Dr. Morgan again directed Cabaniss to stop smoking. (R. 308-09) When she returned on October 28, 2005 and saw Dr. Kellam, Cabaniss stated that although she continued to have a cough with occasional wheezing, she was not experiencing any fevers, chills, chest pain, nausea, or dyspnea. (R. 311) On exam Dr. Kellam found her lungs were clear, he noted she had not needed any oxygen therapy since her hospitalization, and he again stressed the importance of ceasing smoking. (R. 310-11)

In her follow-up exam on November 3, 2005, Cabaniss complained that her cough continued, and Dr. Morgan noted that she had diffuse rhonchi[7] with expiratory wheezing. (R. 313) He also noted that her COPD with acute exacerbation remained unchanged, but she was in no acute distress and a chest x-ray taken the same day showed that her lungs were clear

---

[6] Albuterol is a works by relaxing muscles in the airways to improve breathing, and it is often used to treat wheezing and/or shortness of breath associated with reversible obstructive airway diseases, such as asthma. http://www.drugs.com/albuterol.html.

[7] Rhonchi are dry, low pitched noises produced in the throat or bronchial tube due to a partial obstruction, such as from secretions. Dorland's Illustrated Medical Dictionary 1630 (30th ed. 2003).

11

and she had no disease in the chest or abdomen. (R. 313-14) When she returned on November 29, 2005, although she noted that she was feeling congested, she stated her pneumonia had improved, and Dr. Morgan's treatment notes reveal her lungs were clear with no rales and only occasional rhonchi. (R. 315-16)

Cabaniss returned to Dr. Morgan on January 12, 2006 with complaints of sinus congestion and nausea. (R. 317) Dr. Morgan noted Cabaniss was "mildly ill," but her lungs were clear with no rales, rhonchi, or wheezes. (R. 318) She returned on February 24, 2006 for a follow-up and disability exam, and during the exam she complained that she still has bouts of abdominal pain and nausea. (R. 319)

On April 4, 2006, Dr. Morgan sent a letter to Cabaniss' disability counsel indicating that Cabaniss suffers from poorly controlled hypertension, peripheral vascular disease, COPD, a cerebral aneurysm, a carotid blockage, and irritable bowel syndrome. He also noted she has chronic abdominal pain, fatigue, depression, and anxiety. (R. 352) He also completed a Medical Source Statement of Ability to do Work-Related Activities in which he found Cabaniss could only lift less than ten pounds; she could stand or walk only four hours in an eight hour work day and could sit less than six hours in an eight hour work day; she has limited push/pull use in both her upper and lower extremities due to "overall weakness"; she can only occasionally kneel, crouch, crawl, or stoop and she can never climb or balance; she has limited reaching ability, but unlimited handling, fingering, and feeling ability; and she can only tolerate limited exposure to temperature extremes, noise, dust, humidity/wetness, and hazards, but has no fumes, odors, chemicals, gases, or vibration limitations. (R. 354-57) When asked to clarify his assessment as to the extent of her limitations, Dr. Morgan stated that Cabaniss can only sit four hours a day,

12

and she has marked restriction in her ability to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. 360, 363) Finally, he indicated that due to her impairments Cabaniss would miss three or more days of work a month, (R. 357), which he explained was due to her multiple illnesses. (R. 361, 352-53)

The question presented by this appeal is whether the ALJ appropriately considered the medical opinion of Cabaniss' long term treating physician, Dr. Morgan, that she is unable to work. Although the ALJ was "fully aware that Dr. Morgan opined that claimant is unable to perform substantial gainful activity . . . [and] further indicated that the claimant would miss more than three days from work because of her alleged impairments," (R. 17), he disregarded that opinion, reasoning that Cabaniss' impairments would not preclude sedentary work, with a limited amount of non-exertional limitations.

There is no dispute in this case that Cabaniss has a multitude of severe impairments, including poorly controlled hypertension, peripheral vascular disease, a cerebral aneurysm, and carotid blockages. She also has multiple problems with her gastrointestinal tract, resulting in nausea, diarrhea, and irritable bowel syndrome. Cabaniss also suffers from COPD and chronic headaches. Dr. Morgan's medical records also note that she has chronic problems with fatigue, depression, and anxiety. There is, in short, significant diagnostic and clinical evidence of her myriad health problems. This is not a case based principally on claimant's subjective complaints, as Cabaniss' medical history amply documents her host of severe maladies.

Nevertheless, the ALJ disregarded Dr. Morgan's opinion, finding that Cabaniss could perform gainful employment at the sedentary level of exertion. The ALJ's conclusion is based

13

on two flawed premises. First, the ALJ states that "[t]he evidence further shows that the claimant is able to hear, speak, travel, lift, handle, and carry objects without significant limitations." (R. 17) This conclusion lies in stark contrast to Dr. Morgan's functional assessment, where he stated that she could occasionally and frequently lift not more than five pounds and that she could sit no more than four hours in an eight hour workday. (R. 360) Dr. Morgan's assessment also notes that Cabaniss is limited in pushing and pulling in both her upper and lower extremities by her overall weakness, she is limited in reaching, and she will pass out if she raises her arms over her head for more than two to three minutes. (R. 355-56) Dr. Morgan's assessment also noted several postural limitations. (R. 355)

The ALJ's second rationale is that "[t]he evidence also demonstrates that the claimant is able to perform a wide variety of daily activities and maintain a productive lifestyle." (R. 17) There was no evidence taken at the administrative hearing concerning Cabaniss' daily activities. A fair reading of Cabaniss' submission on this point belies any suggestion that she is able to engage in a wide variety of daily activities. (R. 86-95)

Ultimately, the question devolves to whether Cabaniss' varied impairments constitute sufficient functional limitations precluding her from performing even sedentary work. Dr. Morgan thought so, concluding that all of her illnesses would cause her to miss at least three days of work a month. The transcript of the administrative hearing reveals that ALJ deemed Dr. Morgan's three absences opinion to be significant, stating that if he found it to be credible it "would preclude all work." (R. 386) As such, the ALJ sought further amplification from Dr. Morgan on his absence opinion. (R. 385-87) Although Dr. Morgan later explained that it was all of Cabaniss' illnesses which would cause her to miss this much work, the ALJ's opinion is

14

silent on this issue. Apparently, the ALJ chose to disregard Dr. Morgan's absence opinion, but nothing in the opinion says why he did so. There is no evidence, much less substantial evidence, to support the ALJ's rejection of Dr. Morgan's opinion that Cabaniss' multiple illnesses would cause her to miss at least three days of work a month. While an opinion as to disability is reserved for the Commissioner, it cannot be sustained in this case where the ALJ ignores the treating physician's opinion that Cabaniss would miss at least three days of work a month. See 20 C.F.R. § 416.927 (stating generally that when a treating physician's prognosis or diagnosis is consistent with the record as a whole the ALJ shall not reject that finding, and when the ALJ does reject a treating source's prognosis, the ALJ shall set forth "good reasons" for that decision); see also Hill v. Barnhart, Civ. A. No. 1:06cv0133-BBM-RGV, 2007 WL 438161, at *12 (N.D. Ga. Jan. 16, 2007) (holding that there must be a sound basis in the record for rejecting a treating physician's finding that claimant would miss three or more days of work each month, and when there is no such basis the ALJ's opinion is mere speculation and personal opinion, which may not be substituted for the diagnosis and findings of a medical professional); Walker v. Barnhart, No. Civ. A. 04-11752-DPW, 2005 WL 2323169, at *16 (D. Mass. Aug. 23, 2005) (stating that an ALJ may not substitute his own layman's opinion for a treating physician's opinion as to how many days each month a claimant may miss work). On this issue, it appears that the ALJ chose to substitute his judgment for that of the treating physician, and did so without sufficient foundation in the record.

## VI.

For these reasons, the court finds the Commissioner's disability decision is not supported by substantial evidence. Accordingly, plaintiff's motion for summary judgment is **GRANTED**

and defendant's motion for summary judgment is **DENIED**. As the ALJ noted during the administrative hearing, an issue remains as to the appropriate date of onset. (R. 386-87) As such, this case is remanded with instructions to determine an appropriate onset date and to calculate and pay benefits.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTER:** This 15 day of August, 2007.

Michael F. Urbanski
United States Magistrate Judge